UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PEDRO CARDENAS,

    Plaintiff,

v.                                            CASE NO: 8:09-cv-2357-T-23TBM

GEICO CASUALTY COMPANY,

    Defendant.
_____/

## **ORDER**

On October 21, 2009, the plaintiff sued (Doc. 2) and alleged bad faith failure to settle a claim under an automobile insurance policy. On November 18, 2009, the defendant removed (Doc. 1) and sufficiently alleged diversity jurisdiction under 28 U.S.C. § 1332. The parties file (Docs. 34, 36) cross-motions for summary judgment. Each party responds (Docs. 37, 39) in opposition.

### Undisputed Facts[1]

Pedro Cardenas procured from Geico Casualty Company ("Geico") an insurance policy that provides coverage from April 12, 2006, to October 12, 2006, for damages resulting from an automobile accident.[2] The policy covers losses of no more than

---

[1] Neither the plaintiff's motion (Doc. 34) for partial summary judgment nor the plaintiff's response (Doc. 37) in opposition to summary judgment contains a statement of facts or identifies a disputed issue of fact. Rather, the plaintiff argues that summary judgment in this action is inappropriate because a favorable construction of the facts provides "ample evidence" from which a jury could find that the defendant failed to act "fairly and honestly" toward the plaintiff. (Doc. 37) In moving for partial summary judgment, the plaintiff argues that the defendant's failure to effect a "mirror-image" acceptance of the settlement offer qualifies as a bad faith failure to settle.

[2] (Doc. 36-1)

(1) $10,000.00 per person and $20,000.00 per occurrence in bodily injury and (2) $10,000.00 in property damage.[3] On April 30, 2006, an accident that involved both Cardenas (the plaintiff) and Richard Prater and Rhonda Santonastasi (the "claimants") occurred in Sarasota, Florida.[4]

On May 1, 2006, Cardenas reported the accident to Geico, and on May 2, 2006, Geico advised Cardenas of the coverage limit, of the risk that Cardenas's liability would exceed coverage, and of Cardenas's right to retain an attorney.[5] On May 4, 2006, Geico interviewed Cardenas and again informed Cardenas of the coverage limit and of the risk of liability beyond the policy limit.[6] The same day, Jeffrey Luhrsen, an attorney for the claimants, contacted Geico and requested an insurance disclosure in accord with Section 627.4137, Florida Statutes.[7] On May 30, 2006, Geico responded and provided a copy of the policy.[8] The following day, Geico attempted to contact Luhrsen for information about the claimants.[9] From June, 2006, to August, 2006, Geico repeatedly

---

[3] (Doc. 36-1)

[4] (Doc. 36-2) Cardenas drove a Chevy Tahoe with his brother riding in the passenger seat, and the claimants drove a motorcycle. Neither claimant wore a helmet at the time of the accident. After the accident, Cardenas received a citation for attempting an unsafe u-turn. (Doc. 36-5)

[5] (Docs. 36-3, 36-4)

[6] (Docs. 36-5, 36-6)

[7] (Doc. 36-7)

[8] (Doc. 36-8)

[9] (Doc. 36-9)

attempted to contact Luhrsen (in writing and by telephone) about the status of the claim, but Luhrsen failed to respond.[10]

On August 22, 2006, Geico received from Luhrsen a demand letter (erroneously dated July 13, 2006) that offered to settle the claim. The letter (Doc. 36-12) states (in relevant part):

> Although the value of these claims substantially exceeds the allegedly available liability limits, [the claimants] have authorized me to extend a settlement offer that includes the available liability limits and releases your insured from all liability if and only if our offer is accepted. In order to accept this settlement offer, all of our terms must be accepted by performance no later than 12 p.m. on September 11, 2006. All terms are material and time is of the essence.
>
> . . .
>
> [D]ue to conflicting declaration pages, we must, at a minimum, insist on strict compliance with [Section] 627.4137, Florida Statutes. In addition . . . we must have a sworn or affirmed statement from the liability carrier or carriers and its insured(s) disclosing any additional parties or carriers who may be responsible (either directly or derivatively) for the personal injuries and property damage inflicted on [the claimants]. Please find the following personal property claims:
>
> . . .
>
> If our offer is accepted according to the terms specified in this letter, then [the claimants] will execute complete Releases in favor of you and your insured. However, the Releases must protect only the appropriate parties. The Releases must specify that your insured is being released and not any additional parties. We will also require a release from your insured in favor of Mr. Prater . . . . Finally, disbursement of the settlement proceeds to our clients may not be

---

[10] (Doc. 36-10) Luhrsen deposed (Doc. 36-11) that Luhrsen generally declines to speak with an insurance adjuster and directs a member of his staff to respond, if necessary. According to Luhrsen (Doc. 36-11):

> the insurance adjusters don't have authority to say yes to whatever it is that my clients are asking for. They inevitably have to go to their claims manager or claims committee or something like that. So probably ten years ago I just discontinued the practice of talking with insurance adjusters and I relay messages to them through my staff.

- 3 -

> conditioned upon the execution of hold harmless or indemnity
> agreements. . . . All terms of this unilateral settlement offer are
> material and time is of the essence.

Upon receiving the demand, Geico (1) attempted unsuccessfully to contact Luhrsen to obtain a proposed release for Cardenas to execute,[11] (2) faxed to Luhrsen a request for a proposed release,[12] and (3) attempted to contact Cardenas to inform him of the demand. On August 23, 2006, Cardenas called Geico and agreed to execute the requested documents.[13] Several days later, Geico again attempted to contact Luhrsen (by telephone and in writing). Because Luhrsen failed to provide a proposed release, Geico drafted a release.[14] On August 31, 2006, Geico sent to Cardenas by overnight mail a letter that described the claimants' offer and enclosed an "affidavit and release/hold harmless agreement" for Cardenas to execute with a notary. The letter advised Cardenas that the claimants' property damage exceeded by $66.00 the policy limit and that Cardenas's contributing $66.00 would facilitate settlement.[15]

Upon calling Cardenas on September 6, 2010, Geico learned that Cardenas had neither read the documents sent by Geico on August 31 nor executed the release. Geico (1) advised Cardenas to both review the documents as soon as possible and consider the offer and (2) reminded Cardenas that the settlement offer required a compliant acceptance by Cardenas and Geico no later than noon the following Monday.

---

[11] (Doc. 36-13)

[12] (Doc. 36-15)

[13] (Doc. 36-13)

[14] (Docs. 36-16, 36-17)

[15] (Doc. 36-21)

The next day, Geico called Cardenas and Cardenas stated that he planned to execute and fax each document the following morning.[16] The following morning, after receiving no documents from Cardenas, Geico unsuccessfully attempted to call Cardenas.[17] Geico sent to Cardenas by overnight mail another copy of each document.[18] Cardenas called Geico on Monday, September 11, 2006, and claimed that Cardenas had faxed the documents on Saturday, September 9. Geico had received no fax from Cardenas but told Cardenas that a Geico "field representative," Patrick Jeffares, would retrieve from Cardenas and deliver to Luhrsen the documents before the deadline.[19]

At 11:35 a.m. on September 11, 2006, Jeffares obtained the documents (plus $66.00) from Cardenas and hand-delivered the acceptance to Luhrsen.[20] The acceptance consisted of each item requested in the settlement offer, including checks payable to the claimants for both property damage and the policy's bodily injury limit.[21] As for each "proposed" release (drafted by Geico), Geico advised Luhrsen either to propose to Geico changes to the release or, "if you have releases that you wish to have your client's execute, [to] please fax a copy to our office for review."[22]

---

[16] (Doc. 36-17)

[17] (Doc. 36-22)

[18] (Doc. 36-23)

[19] (Doc. 36-22)

[20] (Docs. 36-24, 36-25)

[21] (Doc. 36-26)

[22] (Doc. 36-26)

At 4:00 p.m., after departing Luhrsen's office, Jeffares realized that he inadvertently failed to leave with Luhrsen the certified copy of the policy. Jeffares immediately called Luhrsen's office, explained the situation, and promised to deliver the policy to Luhrsen the next morning.[23] Despite Geico's subsequent attempts to communicate with Luhrsen in November, 2006, and January, 2007, Luhrsen provided no information to Geico about the status of the settlement.[24] On February 7, 2007, Luhrsen sent to Geico a copy of the complaint filed against Cardenas by the claimants. The action resulted in a final judgment against Cardenas of $970,019.00.[25]

Cardenas sues (Doc. 2) Geico for bad faith failure to settle the claim.

### Discussion

An insurer possesses a duty of "good faith" to an insured "to refrain from acting solely on the basis of the[] [insurer's] own interest[] in settlement." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55, 58 (Fla. 1995). Bad faith conduct by an insurer in settling a claim renders the insurer liable for a judgment against an insured in favor of an injured third party "including an[] amount in excess of the insured's policy limits." 658 So. 2d at 58 (describing this type of claim as a "third-party bad faith action"). The duty of good faith obligates an insurer "to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps [the insured] might take to

---

[23] (Docs. 36-27, 36-28)  Jeffares returned to Luhrsen's office with the policy on September 12, 2006.

[24] (Docs. 36-29, 36-30)

[25] (Doc. 2, Exs. E, F)

avoid same." Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980); see also Johnson v. Geico Gen. Ins. Co., 318 F. App'x 847, 851 (11th Cir. 2009) (finding that "no obligation exists to accept a settlement offer []or to tender policy limits in advance of a settlement offer[] without time for investigation."). Accordingly, "'the essence of a third-party bad faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim.'" Macola v. Gov't Emp. Ins. Co., 953 So. 2d 451, 458 (Fla. 2006) (quoting Cunningham v. Standard Guar. Ins. Co., 630 So. 2d 179, 181 (Fla. 1994)).

Although negligent conduct is relevant to an insurer's good faith, negligent conduct (without more) falls short of "bad faith." DeLaune v. Liberty Mut. Ins. Co., 314 So. 2d 601, 602-03 (Fla. 4th DCA 1975). Furthermore, although a bad faith claim derives from and emphasizes the duty of the insurer to the insured, the conduct of a claimant and the claimant's attorney is relevant to determining the "realistic possibility of settlement." Barry v. Geico Gen. Ins. Co., 938 So. 2d 613, 618 (Fla. 4th DCA 2006) (explaining that the insurer bears the burden of showing the absence—under the "totality of the circumstances"—of a realistic possibility of settlement). A bad faith action is susceptible to summary judgment if the plaintiff lacks sufficient evidence of bad faith. See Shin Crest PTE, Ltd. v. AIU Ins. Co., 368 F. App'x 14 (11th Cir. 2010) (finding that the insurer fulfilled the duty to the insured by attempting, albeit unsuccessfully, to obtain for the insured a release from liability); Johnson, 318 F. App'x at 850 (finding that "Florida appellate courts have affirmed summary judgment [if] the undisputed facts

would allow no reasonable jury to conclude the defendant acted in bad faith.");
Maldonado v. First Liberty Ins. Corp., 546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008);
Gutierrez, 386 So. 2d at 785-86; Caldwell v. Allstate Ins. Co., 453 So. 2d 1187, 1190
(Fla. 1st DCA 1984).

In responding to Geico's motion and in requesting partial summary judgment, Cardenas argues that Geico could have settled the claim by providing a "mirror-image" acceptance of the settlement offer. Cardenas contends that, because Geico responded with a release that contained a "hold harmless provision" and because Luhrsen's offer explicitly stated that "disbursement of the settlement proceeds . . . may not be conditioned upon the execution of hold harmless or indemnity agreements," Geico acted in bad faith toward Cardenas. Therefore, Cardenas asserts that Geico breached Geico's duty to Cardenas by failing to inform Cardenas of Geico's "counter-offer" containing a "hold harmless provision." Geico, however, argues (1) that the facts demonstrate Geico's good faith effort to settle with the claimants; (2) that Geico was the only party attempting a good faith effort to settle; (3) that the record[26] demonstrates the claimants' unwillingness to settle for the policy limit; (4) that Jeffares' inadvertent failure to deliver a copy of the policy with the acceptance is immaterial, because Geico already delivered to Luhrsen a copy of the policy; (5) that, in accord with the settlement offer, Geico imposed no condition that the claimants execute a release in order to receive disbursement of the policy limit; and (6) that Geico's acceptance unequivocally stated

---

[26] Santonastasi deposed (Doc. 36-36) that, at the time Luhrsen sent the letter to Geico, Santonastasi was unwilling to settle for the policy limit because the amount fell short of covering Santonastasi's medical bills.

- 8 -

that the release was a proposed release and that Luhrsen could propose either different language or an entirely different form of release.

In this instance, the facts demonstrate that Geico responded without delay (the day after the accident) to inform Cardenas of the risk of liability beyond the policy limit. Geico promptly responded to Luhrsen's initial request and expended every effort to comply promptly (within twenty days) with each term of the settlement offer, despite Luhrsen's refusing to communicate with Geico and Cardenas's failing to promptly respond to communication from Geico. Geico repeatedly, but to no avail, sought assistance from Luhrsen in drafting an acceptable release. Luhrsen declined to communicate with Geico and left Geico to draft a release. Upon tendering an acceptance, Geico disbursed the policy limit to the claimants (with a check payable to each claimant) and imposed no condition on disbursement. Furthermore, Geico stated a willingness to consider both a change to the propose release and a release drafted entirely by Luhrsen. Luhrsen once again failed to respond. Cardenas cannot—now that Cardenas faces a judgment substantially in excess of the policy limit—rely on some supposed defect in Geico's proposed release or on Geico's inadvertent (but quickly rectified) failure to tender a second, certified copy of the policy. The facts of this action demonstrate no basis upon which a reasonable jury could conclude that Geico acted "solely on the basis of [Geico's] own interest" in attempting to settle the claim. In fact, the facts demonstrate the Geico acted promptly, diligently, and with due concern for Cardenas's best interest.

Conclusion

Accordingly, the defendant's motion (Doc. 36) for summary judgment is **GRANTED**, and the plaintiff's motion for partial summary judgment (Doc. 34) is **DENIED**.  The defendant's unopposed motion to file a reply (Doc. 40) is **DENIED AS MOOT**.  The Clerk is directed to (1) enter a judgment in favor of the defendant and against the plaintiff, (2) terminate any pending motion, (3) and close the case.

ORDERED in Tampa, Florida, on January 13, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE